# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

RAVEN RYON LOVINGS,                    §
                                       §
          *Petitioner*,                §
                                       §
v.                                     §          CIVIL ACTION H-14-0327
                                       §
WILLIAM STEPHENS,                      §
                                       §
          *Respondent*.                §

### MEMORANDUM OPINION AND ORDER

Petitioner Raven Ryon Lovings, a state inmate proceeding *pro se*, filed this section 2254 habeas petition challenging his two convictions and ten-year sentences for sexual assault.  Respondent filed a motion for summary judgment (Docket Entry No. 16), to which petitioner filed a response (Docket Entry No. 19).

Based on careful consideration of the pleadings, the motion, the response, the record, and the applicable law, the Court GRANTS the motion for summary judgment and DISMISSES this case for the reasons that follow.

### *Procedural Background and Claims*

Petitioner was found guilty of two counts of sexual assault and sentenced to ten years incarceration on each count.  The convictions were affirmed on direct appeal, and petitioner did not seek discretionary review.  *Lovings v. State*, 376 S.W.3d 328, 330 (Tex. App.— Houston [14th Dist.] 2012, no pet.).  Petitioner's applications for state habeas relief were denied by the Texas Court of Criminal Appeals without a hearing.

Petitioner raises the following federal habeas claims in the instant petition:

(1)     Trial counsel was ineffective in failing to investigate.

(2)     Trial counsel was ineffective in failing to allow petitioner to testify at trial.

(3)     The evidence is insufficient to support the conviction.

(4)     Trial counsel was ineffective in failing to present a defense or petitioner's version of the incident.

(5)     Trial counsel was ineffective in failing to move for mistrial.

(6)     Trial counsel was ineffective in failing to impeach the complainant.

(7)     The State committed prosecutorial misconduct.

(8)     The convictions constituted double jeopardy.

Respondent argues that five of these claims are procedurally defaulted and barred from consideration, and that all of the claims lack merit.

### *Factual Background*

In affirming petitioner's convictions, the intermediate court of appeals found as follows:

> In January 2009, the complainant was staying with her family at the Reed Motel when she met Lovings, who was dating the complainant's sister. Lovings came to the motel to see the complainant's sister, but she was not there. While Lovings waited for the complainant's sister to return, he engaged in pleasant conversation with the complainant and her mother in their room. The complainant knew Lovings only as 'Raven.'  At some point, the complainant's mother asked Lovings to drive the complainant to a store to run an errand for her.  Lovings agreed, and he and the complainant got in Lovings's car.  At that point, their versions of events sharply differ.

2

According to the complainant, she had been 'chilling out' and getting high with two men just before she met Lovings.  She admitted she was using drugs heavily at the time, and she and the two men had shared a cigarette laced with PCP.  When the men wanted to follow the complainant into her motel room, she refused to let them inside.  Lovings later told her he had made the men leave.  The complainant thought Lovings seemed like a nice guy, so when her mother asked Lovings to drive her to the store, the complainant agreed.  As they drove, however, Lovings repeatedly asked the complainant to go to his house.  The complainant refused.  They began to talk about getting some drugs, and the complainant directed him to a house where they could buy some.  After  arriving at the house, Lovings gave the complainant $10 for cocaine.  She went in, purchased the cocaine, and returned to the car.

As Lovings and the complainant continued on their way, they were talking and 'all of sudden' arrived at Lovings's house.  The complainant refused to go in with Lovings, so he went in alone.  After a minute or so, Lovings came back out to the car and asked the complainant to come in and help him look for his marijuana.  She agreed, thinking she would not be in the house long.  Lovings immediately went to his bedroom and began 'hitting' the cocaine.  The complainant sat on the edge of the bed.  Lovings asked the complainant if she wanted to 'hit' the cocaine, and she said, "No, I'm not hitting that because you might think I'm here to do something with you and — no."  Lovings told the complainant, 'It's not like that,' and so she agreed to 'hit' the cocaine with him.  After they used the cocaine, the complainant told Lovings they needed to leave, but Lovings hit the complainant and said, 'You're not going nowhere . . . get your ass back on that bed.'  Fearing for her safety, the complainant did as Lovings told her.  The complainant then saw a knife on the dresser.  In an attempt to protect herself, she grabbed the knife and 'went for him in his chest area.'  They wrestled over the knife, and Lovings eventually overpowered the complainant.  As the complainant tried to hold onto the knife, she pulled on the sharp edge and cut her finger 'wide open.'  The knife broke in half.

Lovings wrestled the complainant to the floor and put his foot on her neck.  He began hitting her, yelling, 'bitch . . . you tried to stab me.'  Lovings threatened to kill the complainant if she did not get on the bed and take her clothes off.  Fearing for her life, the complainant complied, and Lovings began raping her.  Lovings first sexually assaulted the complainant vaginally, and then he turned her around and sexually assaulted her anally.  The complainant pleaded with Lovings to stop because it hurt, but he told her to 'shut up' as he continued to rape her.

3

Throughout these attacks, Lovings continued to beat and threaten the complainant.  At one point Lovings threatened to call other men over to gang rape the complainant; at another point, he threatened to put her in the trunk of his car.  The complainant was afraid and believed him.  Lovings would not let the complainant out of his sight while he was awake, and when he slept he kept his arm around her so that she could not leave.  The complainant tried to sneak away, but he awoke and began hitting and sexually assaulting her again. the complainant's face began to swell from the blows.

The next day, the complainant told Lovings she was pregnant and needed to get something to eat, but Lovings would not let her leave.  He also refused to let her call anyone.  The complainant repeatedly asked him to take her to get something to eat, and around noon he finally agreed to take her to McDonald's.  Lovings gave the complainant a sock with which to wrap her finger, but he refused to let her put her underwear or jacket on.  Although the complainant had a can of mace in her jacket, she was afraid to try to use it because her earlier attempts to defend herself had been unsuccessful.

When Lovings and the complainant left the house, the complainant ran from him and tried to get the attention of people nearby.  Lovings pulled up to the complainant in his car, but she refused to get in.  Instead, she ran down the street, crying and screaming for help.  The complainant went inside a convenience store where a stranger helped her get change to call the police.  An ambulance arrived and took the complainant to the hospital.

At the hospital, the complainant told Officer Raul Yzquierdo of the Houston Police Department what had happened to her.  The complainant also recounted the assaults to the hospital personnel and she was given a sexual-assault examination.  About a month after the complainant was released from the hospital, Yzquierdo picked her up and drove her to a police station, where he showed her photographs of possible suspects.  The complainant identified Lovings as her assailant.

Lovings did not testify at trial, but the prosecution presented to the jury a lengthy video statement he made to Yzquierdo and Sergeant Brian Harris.  The jury heard Lovings explain that he went to the Reed Motel to wait for his girlfriend, the complainant's sister, with whom he had plans that evening.  He prevented the two men who had been with the complainant from entering the motel room she was sharing with her mother and sister.  The two men told him they each had given the complainant $20 of 'powder' and she had agreed to

4

have sex with them.  After the men left, Lovings visited with the complainant and her mother while waiting for the complainant's sister to arrive.  He was drinking.  The complainant's sister kept coming in and then going outside and driving off with other men.  Lovings grew increasingly upset and drank too much.  The complainant wanted him to take her to get more 'powder' and he told her she had already had enough.

When the complainant's mother asked the complainant and Lovings to go to the store for her, the complainant grabbed his arm and they went to the car.  As he drove, the complainant asked him for $10 and directed him to a house, which he recognized as the house where the complainant's sister bought cocaine.  The complainant went into the house and came back with cocaine.  Lovings took the cocaine from her and told her it was for her sister.  He drove to his house while the complainant kept asking for the cocaine.

When they arrived at his house, Lovings went in and left the complainant outside.  He went to sleep in his bedroom.  Sometime later he was awakened by the complainant bursting through the door and insisting that he give her the cocaine.  At first he refused, but eventually he relented and gave her some.  The complainant wanted more cocaine and became aggressive.  Lovings turned away from her to return to his bedroom, and the complainant stabbed him on the back of his shoulder with a knife.  He showed the interviewing officers a cut on his back.  Lovings accused the complainant of trying to kill him, and he punched her several times in self-defense.  The complainant began to cry and told Lovings that CPS had just taken her seven children.  Lovings saw that the complainant had cut her finger while holding the knife and was bleeding, but she said she did not care.  Lovings pried her fingers open and took the knife from her.  He did not know how the knife broke.  The complainant kept asking him to give her the cocaine and to drive her home.  He told her he would not drive her home because he had been drinking.

Lovings said he talked with the complainant a long time, telling her she needed to get off drugs, get God in her life, and show CPS she could be a good mother.  He gave her the cocaine on the condition that there be no more 'drama.'  Later, the complainant got into bed with him, and they had both vaginal and anal consensual sex.  In the morning he awoke to find her 'messing with' him and they had sex again.  She told him she needed food because she was pregnant and asked him to take her to McDonald's.  Lovings was very worried about the complainant's sister and mother finding out about their night together and he let her know they had no future together.  The

complainant's attitude toward him began to change.  They got dressed and went to the car; Lovings asked if the complainant wanted to drive or if she wanted him to drive.  She said, 'I'm OK,' and went across the street.  He went to McDonald's by himself.  When Lovings returned home from McDonald's, his relatives were outside his house and a cousin told him the police were on the way because a woman had reported that he raped her.  Lovings immediately drove to the Reed Motel to talk to the complainant's sister and mother to ask them if the complainant had mental or emotional problems.  The complainant's sister told him the complainant was at the hospital and had said her face was swollen.

The jury also heard from other witnesses who testified concerning the incident. Officer Reese Hardy testified that he responded to the sexual assault call.  He arrived at Lovings's residence and received permission from the owner to enter.  Inside, he saw blood on the floor, bloody rags or towels, and a broken knife handle near a bedroom.  In the bedroom, he saw female clothing and a pair of panties on the floor.

Officer Yzquierdo testified that when he interviewed the complainant, she was able to give a physical description of her assailant and his first name, 'Raven.' She also described him as having the word 'Beast' tattooed on his chest. Yzquierdo saw no indication that the complainant was intoxicated or high on drugs.  Officer Yzquierdo's investigation led him to Lovings.  Yzquierdo prepared a photo lineup that included Lovings for the complainant to review. When the complainant reviewed the lineup, she identified Lovings as her assailant.  Yzquierdo also conducted a more detailed interview with the complainant in which she admitted she had been using drugs and she went into Lovings's house to look for marijuana, but she denied it was a 'sex-for-drugs situation.'  Officer Harris, who interviewed Lovings, testified that in his opinion, Lovings was very egotistical, 'almost had a superiority complex,' and viewed himself as a 'redeemer' of women.  Harris formed his opinion of Lovings in part based on documents Lovings authored which Harris reviewed in preparation for the interview.  [FOOTNOTE 1.  The State introduced one of Lovings' writings found in a spiral notebook titled 'Beast on a Bike,' which read as follows:  One night a 27 year old woman was walking at 12:30 pm. She ran into a beast on a bike.  She said she was going to the store, although all stores were close[d] —but she wanted him to pump her on his bike.  She hop[p]ed on the handle bars, and she said she could not get off until she got to his house.  When they got inside Beast beat and raped her and rode off into the sunset.  The pussy must have been bad.  No one has seen him since.  You

6

decide, breaking news or joke.  In his police interview, Lovings explained that a cousin gave him the nickname 'Beast.']  Harris also testified that based on his interview of Lovings, he concluded Lovings was 'fairly intelligent' and thought that Lovings's answers 'were extremely well-calculated to account for any type of physical evidence.'

Dr. Megan McCarthy testified that she performed the sexual-assault examination on the complainant.  She explained that the complainant's medical records reflected that she complained of repeated physical and sexual assault and was suffering emotional distress.  The complainant also had a laceration on her finger, a bruised eye, and redness on her elbow.  Dr. McCarthy also confirmed that the complainant was twenty-seven years old and pregnant.  The pelvic exam Dr. McCarthy performed on the complainant revealed no signs of trauma in either the vaginal or rectal areas, but Dr. McCarthy explained that a lack of trauma does not necessarily mean that a sexual assault has not occurred because 'the vagina is very accommodating for intercourse.'  Another factor was the complainant's vaginal deliveries of at least six of her children, which Dr. McCarthy explained could result in a 'laxity in the muscles of the perineum.'  Dr. McCarthy also explained that multiple births could result in 'tissue laxity' of the anus, but she acknowledged she was not an expert in that area.  She also admitted she did not check for sphincter damage caused by multiple vaginal deliveries.  However, she testified that most sexual assaults do not result in signs of trauma.  Claudette Nance, a neighbor of Lovings, also testified.  She was sitting in her yard with her daughter and some friends when she saw Lovings and a woman come out of his house and begin walking toward his car.  When they got near the driveway, the woman 'jumped the ditch' and said, 'Y'all know him? He raped me.'  Nance heard Lovings say, 'Girl, what are you doing?  We [are] fixing to get something to eat.'  The complainant then ran down the street looking for help.  Lovings got in his car and left, returning a short time later with some food.  By then, many people had gathered around his house.  Someone told Lovings he was accused of rape, and Lovings drove off.  Nance never saw him again.

*Lovings*, 376 S.W.3d at 330–334.

### *The Applicable Legal Standards*

*Habeas Review*

This petition is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U.S.C. § 2254.  Under the AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  *Harrington v. Richter*, ___U.S. ___, 131 S. Ct. 770, 785 (2011); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2).  A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent.  *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409.  In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable.  *Id*. at 411.

8

The AEDPA affords deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller–El v. Cockrell*, 537 U.S. 322, 343 (2003). A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 330–31.

*Summary Judgment*

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and the summary judgment evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

While summary judgment rules apply with equal force in a section 2254 proceeding, the rules only apply to the extent that they do not conflict with the federal rules governing habeas proceedings. Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed

9

facts must be construed in the light most favorable to the nonmovant.  Accordingly, unless a petitioner can rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence, the state court's findings must be accepted as correct by the federal habeas court.  *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

### *Procedural Default*

Under 28 U.S.C. § 2254(b)(1)(A), a state inmate's petition for federal habeas relief will not be granted unless the inmate has exhausted his state court remedies by presenting his claim the highest court of the state for review.  *Jones v. Jones*, 163 F.3d 285, 297–99 (5th Cir. 1998).  For purposes of exhaustion, the Texas Court of Criminal Appeals is the highest state court in Texas which has jurisdiction to review a petitioner's conviction.  *Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985).  To proceed before that court, a petitioner must either file a petition for discretionary review or an application for a post-conviction writ of habeas corpus.   To provide the State with the necessary opportunity to address a petitioner's claims, each claim must be fairly presented in the appropriate state court.  *Nobles v. Johnson*, 127 F.3d 409, 420 (5th Cir. 1997).

Under Article 11.07, § 4 of the Texas Code of Criminal Procedure, a petitioner would be barred by application of the abuse of the writ rule if he attempted to exhaust his claims through a subsequent application for state habeas relief.  As a result, such claims would be

barred from consideration by the federal district court under the procedural default doctrine. *Id.* at 423.

Under limited circumstances, a petitioner may overcome his procedural default and obtain federal habeas review of his claims if he can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Sones v. Hargett*, 61 F.3d 410, 416 (5th Cir.1995). If a petitioner is unable to show cause and prejudice, he can obtain habeas review only if he can show that applying the procedural bar would constitute a fundamental miscarriage of justice. *House v. Bell*, 547 U.S. 518, 536 (2006); *see also Murray v. Carrier*, 477 U.S. 478, 496 (1986). By "fundamental miscarriage of justice" is meant that the petitioner was actually innocent of the crime. *Sawyer v. Whitley*, 505 U.S. 333, 339–40 (1992); *Finley v. Johnson*, 243 F.3d 215, 220 (5th Cir. 2001). He must establish that, more likely than not, in light of new evidence, "no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538.

Respondent correctly argues that petitioner's habeas grounds 3, 5, 6, 7, and 8 are procedurally defaulted and barred from consideration by this Court. As to ground 3 challenging the sufficiency of the evidence, petitioner presented this issue to the intermediate state appellate court, but did not pursue the issue in the Texas Court of Criminal Appeals through a petition for discretionary review. Accordingly, the issue is procedurally defaulted

and barred from consideration at this juncture, and petitioner establishes neither cause and prejudice or a fundamental miscarriage of justice. *See West v. Johnson*, 92 F.3d 1385, 1389 n. 18 (5th Cir. 1996); *Renz v. Scott*, 28 F.3d 431, 432 (5th Cir. 1994).

Even assuming the insufficiency of the evidence issue were properly before this Court, the issue lacks merit.  To review the sufficiency of the evidence, a federal court must consider whether, viewing all the evidence "in the light most favorable to the prosecution, any rational trier of fact could have found the existence of facts necessary to establish the essential elements of the offense beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 318–18 (1979).  In making this determination, the reviewing court must resolve all credibility choices and conflicting inferences in favor of the fact finder.  *United States v. Cyprian*, 197 F.3d 736, 740 (5th Cir. 1999).  Having applied these well-established standards in its review of the state court record, this Court finds sufficient evidence to support the conviction.

Petitioner raised claims on state collateral review for ineffective assistance of trial counsel, but did not claim that counsel was ineffective in failing to move for a mistrial or that counsel failed to impeach the complainant with inconsistent testimony.  Where distinct ineffective assistance of counsel claims are presented, each should be analyzed independently in determining exhaustion. *Jones v. Jones*, 163 F.3d 285, 296–98 (5th Cir. 1998); *Thomas v. Collins*, 919 F.2d 333 (5th Cir. 1990).  Accordingly, federal habeas grounds 5 and 6 are procedurally defaulted and barred from consideration by the Court.  Even assuming the issues

were properly before this Court, they are without merit.  Petitioner fails to show that, had

counsel moved for mistrial, it would have constituted reversible error under state law for the

state trial court to deny the motion.  Petitioner further fails to establish that, but for counsel's

failures to move for mistrial or to impeach the complainant with alleged prior testimony,

there is a reasonable probability that the result of his trial would have been different.

*Strickland v. Washington*, 466 U.S. 668 (1984).

Moreover, petitioner failed to raise claims for prosecutorial misconduct or double

jeopardy on either direct or collateral review, and federal habeas grounds 7 and 8 are

unexhausted, procedurally defaulted, and barred from consideration by this Court.

Petitioner fails to establish good cause or prejudice regarding his default for any of

these claims, nor does he show that applying the procedural bar will constitute a fundamental

miscarriage of justice under the facts of this case.  Plaintiff's habeas grounds 3, 5, 6, 7, and

8 are procedurally defaulted and dismissed.

### *Ineffective Assistance of Counsel*

The Sixth Amendment to the United States Constitution guarantees a criminal

defendant the right to the effective assistance of counsel.  U.S. CONST. amend. VI.  A federal

habeas corpus petitioner's claim that he was denied effective assistance of counsel is

measured by the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  To

assert a successful ineffectiveness claim, a petitioner must establish both constitutionally

deficient performance by counsel and actual prejudice as a result of counsel's deficient

13

performance.  *Id*. at 687.  The failure to demonstrate either deficient performance or actual prejudice is fatal to an ineffective assistance claim.  *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

A counsel's performance is deficient if it falls below an objective standard of reasonableness.  *Strickland*, 466 U.S. at 688.  In determining whether a counsel's performance was deficient, judicial scrutiny must be highly deferential, with a strong presumption in favor of finding that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy.  *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996).  To overcome this presumption, a petitioner must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992).  However, a mere error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.  *Strickland*, 466 U.S. at 691.

Actual prejudice from a deficiency is shown if there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id.* at 694.  To determine prejudice, the question focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  In that regard, unreliability or unfairness

does not result if the ineffectiveness does not deprive the petitioner of any substantive or procedural right to which he is entitled. *Id.*

Petitioner claims that trial counsel was ineffective in the following particulars:

*Failure to Investigate*

Petitioner claims that trial counsel did not interview or present available lay and expert witnesses, did not look at the indictment in order to object to the State's attempts to amend it, and did not examine the scene of the crime or other physical evidence.

In responding to petitioner's allegations on state collateral review, trial counsel testified by affidavit as follows:

> To investigate and prepare for trial, I: (1) spent numerous hours interviewing the defendant, (2) spent numerous hours looking at the State's file, (3) had a private investigator appointed and consulted with her regarding her investigation, (4) researched the complainant's criminal history and (5) made several efforts to contact the complainant, (6) spent numerous hours interviewing members of the defendant's family.

> \*   \*   \*   \*

> I spent numerous hours discussing the results of the investigation in this case and appropriately advised [petitioner] of his options regarding trial or plea.

> I have read the defendant's claims regarding my representation and can unequivocally state that they are complete nonsense.

*Ex parte Lovings*, pp. 58–58A.

In rejecting petitioner's claim of ineffective assistance of trial counsel, the trial court on collateral review made the following relevant findings of fact:

15

1.      The Court finds that the facts asserted in the affidavit of [trial counsel] in [this case] are true and that the affidavit of [trial counsel] is credible and that [trial counsel] represented the applicant in connection with the primary case.

\*      \*      \*      \*

4.      The Court finds based on the credible affidavit of [trial counsel] that [trial counsel] conduct[ed] an adequate investigation.  Specifically, [trial counsel] spent numerous hours interviewing the applicant and his family, looking at the State's files, acquired and consulted an investigator, researched the complainant's background, and made several efforts to contact the complainant.

5.      The Court finds that [C.K.] of Ironhouse Investigations was employed as a private investigator on applicant's behalf.

6.      The Court finds that [trial counsel] discussed the results of the investigation with the applicant as to his options concerning pleading guilty or going to trial.

7.      The Court finds that [the] clerk's file supports [trial counsel's] assertions as demonstrated by the Harris County Attorney Fees Expense Claims.

*Id.*, pp. 60–61 (record cites omitted).  The trial court also made the following relevant

conclusions of law:

1.      The applicant fails to show that counsel's conduct fell below an objective standard of reasonableness and that, but for trial counsel's alleged deficient conduct, there is a reasonable probability that the result of the proceeding would have been different.

2.      The applicant fails to show what a more thorough, in-depth investigation would have revealed by [trial counsel].

3.      The applicant fails to show what witnesses that were available and who were not called by [trial counsel] and that their testimony would have have been of some benefit to the defense.

16

4.    The totality of the representation afforded the applicant was sufficient to protect his right to reasonably effective assistance of counsel in the primary case.

*Id.*, p. 62 (citations omitted).  The Texas Court of Criminal Appeals expressly relied on these findings and conclusions in denying habeas relief.  *Id.*, at cover.

To prevail on a habeas claim that counsel failed to interview lay witnesses or retain and present expert witnesses, a petitioner must name the witnesses, provide evidence of their anticipated favorable testimony, and show that they were available for trial and were willing to testify.  *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) (petitioner who asserts ineffective assistance of counsel based on omitted witnesses must "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to the particular defense").  Petitioner's conclusory allegations of omitted lay and expert witnesses are unsupported in the record and do not constitute probative summary judgment evidence for purposes of the pending proceeding.  Petitioner is not entitled to federal habeas relief on his claims of failure to investigate or call witnesses.

Further, petitioner is not entitled to habeas relief on his assertion that trial counsel failed to read the indictment in order to object to the State's "last minute" efforts to amend it.  Although the parties discussed immediately before trial the need to correct the date of the event in the indictment, the record shows that the State filed the motion to amend on February 22, 2011, and that it was granted on February 25, 2011.  The motion was timely

17

filed under article 28.10 of the Texas Code of Criminal Procedure, and petitioner fails to establish that counsel was deficient in failing to object to the amendment.  Petitioner also fails to demonstrate that, but for counsel's failure to raise an objection to any wording of the indictment, there is a reasonable probability that the result of the trial would have been different.  The particular indictment language complained of by petitioner appears in the jury charge regarding aggravated sexual assault; the jury, however, found petitioner guilty of the lesser-included offense of sexual assault and did not find him guilty of aggravated sexual assault.  Thus, petitioner cannot demonstrate that he was prejudiced by counsel's failure to objection under these circumstances, and no ineffective assistance of trial counsel is shown.

Nor can petitioner demonstrate that he was prejudiced by counsel's alleged failure to examine the crime scene or other physical evidence.  To prevail on his claim, petitioner must present probative evidence of what such investigation or examinations would have shown, and how it would have changed the outcome of the trial.  *See Miller v. Dretke*, 420 F.3d 356, 361 (5th Cir. 2005). This, he fails to do, and deficient performance and prejudice are not shown.

The state court denied relief on petitioner's claims of ineffective assistance.  Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  Respondent is entitled to summary judgment dismissal of these claims.

*Failure to Allow Petitioner to Testify*

Petitioner claims that trial counsel did not allow him to testify at trial.  In responding to petitioner's allegations on state collateral review, trial counsel testified by affidavit that, "I had extensive discussions with [petitioner] concerning his right to testify.  Any claim that I coerced or prevented him from testifying at the guilt stage of trial is ludicrous."  *Ex parte Lovings*, p. 59.

The trial court found counsel's affidavit testimony credible, rejected petitioner's claim, and made the following relevant findings of fact and conclusions of law:

1.     The Court finds that the facts asserted in the affidavit of [trial counsel] in [this case] are true and that the affidavit of [trial counsel] is credible and that [trial counsel] represented the applicant in connection with the primary case.

2.     The Court finds based on the credible affidavit of [trial counsel] that [trial counsel] had extensive discussions with the applicant concerning applicant's right to testify.

3.     The Court finds that [trial counsel] did not coerce or otherwise prevent the applicant from testifying.

*Ex parte Lovings*, p. 60 (record citations omitted).  The trial court further made the following relevant conclusions of law:

1.     The applicant fails to show that counsel's conduct fell below an objective standard of reasonableness and that, but for trial counsel's alleged deficient conduct, there is a reasonable probability that the result of the proceeding would have been different.

\*     \*     \*     \*

4.     The totality of the representation afforded the applicant was sufficient to protect his right to reasonably effective assistance of counsel in the primary case.

*Id.*, p. 62 (citations omitted).  The Texas Court of Criminal Appeals expressly relied on these findings and conclusions in denying habeas relief.  *Id.*, at cover.

Petitioner attempts to refute the state trial court's adverse findings and conclusions by submitting to this Court two written statements from family members.  (Docket Entry No. 19, p. 32–33.)  These documents, however, were not presented to the state trial court, do not constitute any part of the state court record, and cannot be considered by the Court at this late juncture.  *See Cullen v. Pinholster*, ___U.S. ____, 131 S. Ct. 1388, 1398  (2011) (holding that "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits").

The state court denied relief on petitioner's claims of ineffective assistance.  Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  Respondent is entitled to summary judgment dismissal of this claim.

*Failure to Present a Defense or Petitioner's Version of the Incident*

Petitioner complains that trial counsel failed to put on a defense or present petitioner's version of the events.  According to petitioner's version of the incident as outlined in his pleadings, the complainant broke into petitioner's house during the night looking for her

sister's drugs, and that she cut her own hand with a knife while stabbing petitioner in the back.  Petitioner claims that he gave her the drugs, and that they then had consensual sex.

Petitioner did not expressly raise these two grounds on state collateral review, but did raise issues complaining of counsel's presentation of his case.  In the interest of justice and to provide petitioner the liberal construction of his pleadings required under *Haines v. Kerner*, 404 U.S. 519, 520 (1972), the Court will address his two grounds in context of the issues he raised on state collateral review.

In his application for state habeas relief, petitioner complained that trial counsel "conceded" petitioner's guilt and failed to call petitioner or other witnesses during the suppression hearing.  The Court has reviewed the record, and finds no instance of trial counsel conceding that petitioner sexually assaulted the complainant.  The record reflects that trial counsel's theory of defense had been that the incident had been one of "drugs for sex," whereby petitioner had purchased drugs for the complainant in exchange for fully consensual sex.  Further, for the same reasons he failed to demonstrate ineffective assistance as to omitted witnesses at the guilt-innocence phase of trial, petitioner fails to establish ineffective assistance as to omitted witnesses at the suppression hearing.  *See Day*, 566 F.3d at 538, holding that a petitioner asserting ineffective assistance based on omitted witnesses must "name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony

would have been favorable to the particular defense." Petitioner fails to meet this burden, and his conclusory allegations of omitted witnesses do not entitle him to habeas relief.

Moreover, the jury heard petitioner's version of the event when petitioner's videotaped statement to the police was published to the jury. (Docket Entry No. 10-15, pp. 183–190.) Only petitioner and the complainant could have testified as to whether their sexual encounter was or was not consensual, and petitioner elected not to testify during the guilt-innocence phase of trial. Petitioner states that he testified to his version of the events during the punishment hearing. The Court notes that petitioner's recounting of the incident as it appears in the punishment hearing record was inconsistent and disjointed, unsupported by the physical evidence introduced at trial, and difficult to envision. Petitioner fails to establish that, but for counsel's alleged failure to present petitioner's version of the events during the guilt-innocence phase of trial, there is a reasonable probability that the result of the trial would have been different.

The Court also notes that petitioner's arguments regarding his punishment hearing run far afield of the actual record. In his response to the motion for summary judgment, petitioner repeatedly claims that the record shows "the Jury['s] refusal to send Lovings to prison and refusal to participate in the trial any further. Specially, the Jury asked for the Judge, declared they refused to participate any further; one Jury [sic] even threatened a nerveous [sic] breakdown if she was not released." (Docket Entry No. 19, p. 6.) At another point in his response, petitioner claims that, "With great resistance from [trial counsel], later,

during sentencing, Lovings was able to give his testimony, the Jury heard and believed him, regretted their previous guilty vote, refused to send Lovings to prison, and demanded to Judge to release them." *Id*., p. 5.

The Court has carefully reviewed the state court record, and finds that none of these events as alleged by petitioner appear in the record; indeed, there is not even the remotest of a suggestion that they occurred.  The actual event giving rise to petitioner's fantastical assertions is far less spectacular:  at some point during punishment deliberations, the jury foreman sent a note to the judge stating that, "Your Honor, we have a serious issue. A juror insists she did not agree to assess punishment. She is in tears.  My opinion is she is near breakdown."  (Docket Entry No. 10-18, p. 152.)  A single juror was involved, one who apparently had not understood or accepted her role as a juror in assessing punishment.  The record does not disclose this juror's beliefs regarding petitioner's particular punishment, nor does it indicate how the remaining jurors viewed petitioner's punishment.  The jurors did not demand that they be released, nor did they refuse to send petitioner to prison or evince any regret over their guilty verdict.  Although the jury foreman's note did leave the trial court, prosecutor, and defense counsel with a procedural quandary, it was subsequently resolved when petitioner himself agreed on the record to waive the jury and have the trial court assess punishment.  *Id*., p. 158.

The state court denied relief on petitioner's claims of ineffective assistance.  Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable

23

application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record.  Respondent is entitled to summary judgment dismissal of these claims.

### *Conclusion*

Respondent's motion for summary judgment (Docket Entry No. 16) is GRANTED and this lawsuit is DISMISSED WITH PREJUDICE.  A certificate of appealability is DENIED.  Any and all pending motions are DENIED AS MOOT.

Signed at Houston, Texas on September 30, 2014.

_____
Gray H. Miller
United States District Judge

24